**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT,<br><br>Plaintiff,<br><br>v.<br><br>BROADCOM INC. and AVAGO TECHNOLOGIES INTERNATIONAL SALES PTE. LIMITED,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 2:26-cv-00775-JRG |

**BROADCOM INC.'S AND AVAGO TECHNOLOGIES INTERNATIONAL SALES PTE. LIMITED'S ANSWER TO COMPLAINT FOR DECLARATORY JUDGMENT OF NONINFRINGEMENT AND COUNTERCLAIMS**

Broadcom Inc. and Avago Technologies International Sales Pte. Limited (collectively, "Broadcom"), by and through their undersigned counsel, hereby submit the following Answer and Counterclaims in response to Plaintiff Bayerische Motoren Werke Aktiengesellschaft's ("BMW AG") Complaint for Declaratory Judgment of Noninfringement.

## PRELIMINARY STATEMENT

Broadcom's inventions unleashed Automotive Ethernet, an in-vehicle networking technology that, today, connects cameras, displays, driver-assistance systems, infotainment units, and other devices in automobiles. BMW AG knows that Broadcom's innovations made this possible. In 2007, BMW AG wanted to use Ethernet inside its vehicles, but could not overcome a fundamental obstacle: standard Ethernet was too susceptible to electromagnetic interference during the vehicle's operation without using expensive and cumbersome shielding in the vehicle's cabling. BMW AG's engineers "identified the problem, but could not solve it." Matheus, K., *Automotive Ethernet* 3rd ed., Cambridge University Press, 2021 ("*Automotive Ethernet*"), at xv.

BMW AG approached four well-known semiconductor suppliers for a solution. *Automotive Ethernet* at xv, 85–86. One did not reply, and two others "thought the BMW request impossible." *Automotive Ethernet* at xv, 86. But Broadcom responded positively and achieved the "impossible." *Automotive Ethernet* at xv, 85–86. In January 2008, BMW AG tested a 100 Mbps Ethernet physical-layer (PHY) technology that Broadcom engineers had developed for the automotive environment, and the very first measurements proved successful. *Automotive Ethernet* at xv. In the words of BMW AG's own engineers: "This was when Automotive Ethernet was born." *Automotive Ethernet* at xv.

Broadcom's suite of technological innovations became known as 100BASE-T1 or "BroadR-Reach"—a name derived from "Broadcom." *Automotive Ethernet* at 86. BMW AG's engineers have called BroadR-Reach "the door opener to Automotive Ethernet." *Automotive Ethernet* at 86. They have acknowledged that "[t]he BroadR-Reach technology was developed by Broadcom, who also own the respective Intellectual Property Rights (IPR) on the technology." *Automotive Ethernet* at 92. Broadcom has also created novel solutions in Wi-Fi, Bluetooth, NFC, cloud computing, and other key technologies used in the automotive industry. Through their continuous innovation, Broadcom and its related companies have been awarded a robust patent portfolio. The Broadcom group remains an industry leader in Automotive Ethernet semiconductor chips, among many other products, offering a comprehensive product portfolio for Automotive Ethernet PHYs, Switches, and Microcontrollers.

Recognizing that its vehicles depend on Broadcom's patented technology, BMW AG took a license to Broadcom's patent portfolio in 2020. Much of the automotive industry has done the same, including many of BMW AG's competitors. And when it has come time for those

carmakers to renew their licenses, all—except BMW AG—renewed before their licenses expired (and without any litigation).

BMW AG chose a different path. Upon expiration of its original license on July 1, 2026, BMW AG had legitimate options, including: (1) renewing the license or (2) ceasing to use infringing technology in its vehicles. BMW AG chose a third, albeit unlawful, option—willfully infringing the patents and refusing to pay for using key, patented innovations. Even worse, BMW AG filed this action in an attempt to avoid licensing Broadcom's technology and as a transparent countersuit to German infringement actions pending on the same family of patents.

BMW AG's conduct is even more remarkable because the Regional Court in Munich, Germany, where BMW AG is headquartered, has already rejected a noninfringement theory similar to that in BMW AG's allegations against U.S. Patent No. 7,835,389 ("the '389 Patent"). In February 2026, the Munich Regional Court found that automaker Renault infringed European Patent No. EP 1 903 733—the European counterpart of the '389 Patent (*see* Dkt. 1, ¶ 18)—through its vehicles equipped with 100BASE-T1 automotive Ethernet chips. The Munich Regional Court enjoined Renault from selling those infringing systems in Germany and ordered the infringing products recalled and destroyed. The court held that "the 100-BASE-T1 standard makes use of the teaching of the patent in suit with regard to all features," including the claimed mapping of 3-bit IDLE patterns—the very limitation that BMW AG says its vehicles do not practice. Dkt. 1, ¶ 37. Yet, on information and belief, BMW AG's vehicles rely on the same supplier (and others) that provides the 100BASE-T1 Ethernet chips in Renault vehicles. And BMW AG's own Complaint concedes that "[c]laim 1 of the '389 Patent and claim 1 of this patent's European counterpart patent have the same limitations." Dkt. 1, ¶ 36. BMW AG nonetheless has elected to proceed with its willful infringement in disregard of Broadcom's patents.

Broadcom seeks to hold BMW AG accountable for its willful infringement of Broadcom's valuable and patented technologies. This pleading thus answers BMW AG's Complaint and asserts Counterclaims for infringement of the three patents BMW AG attacks as well as three additional Broadcom patents related to Ethernet networks in vehicles—U.S. Patent Nos. 9,065,673; 10,021,041; and 11,025,364. Broadcom is entitled to recover damages adequate to compensate it for BMW AG's infringing activities in an amount to be determined at trial, including lost profits but in no event less than a reasonable royalty, and seeks a permanent injunction to end BMW AG's ongoing willful infringement.

## ANSWER

Each of the paragraphs below corresponds to the same numbered paragraph in the Complaint. In responding to the Complaint, Broadcom has kept BMW AG's headings for ease of reference, but in doing so, Broadcom is not admitting to the accuracy of any statements made or agreeing with any characterizations made in such headings. Broadcom denies all allegations in the Complaint, whether express or implied, that are not specifically admitted below. Broadcom further denies that BMW AG is entitled to the relief requested in the Complaint, or to any other relief.

## NATURE OF THIS ACTION

1. Broadcom admits that the Complaint purports to set forth a cause of action for declaratory judgment of noninfringement of U.S. Patent Nos. 7,835,389 ("the '389 Patent"); 7,936,778 ("the '778 Patent"); and 9,137,672 ("the '672 Patent"). Broadcom otherwise denies the allegations contained in this paragraph.

2. Broadcom admits that Avago Technologies International Sales Pte. Limited is the current owner of each of the '389 Patent, '778 Patent, and '672 Patent. Broadcom admits that

Avago Technologies International Sales Pte. Limited is an indirect subsidiary of Broadcom Inc. Broadcom otherwise denies the allegations contained in this paragraph.

3. Broadcom admits that, in order to protect its intellectual property rights, on June 11, 2026, Avago Technologies International Sales Pte. Limited initiated an infringement proceeding against BMW AG at the Landgericht München I, Docket No. 7 O 5786/26, with respect to European Patent No. EP 1 903 733 B1. Broadcom admits that, in order to protect its intellectual property rights, on August 5, 2026, Avago Technologies International Sales Pte. Limited initiated an infringement proceeding against BMW AG at the Landgericht München I, Docket No. 21 O 7936/26, with respect to European Patent No. EP 1 931 086. Broadcom otherwise denies the allegations contained in this paragraph.

4. Denied.

## PARTIES

5. Broadcom lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and on that basis denies the same.

6. Broadcom Inc. is a Delaware corporation. Broadcom otherwise denies the allegations contained in this paragraph.

7. Avago Technologies International Sales Pte. Limited is a corporation formed under the laws of Singapore with a place of business at No. 1 Yishun Avenue 7, Singapore 768923. Broadcom otherwise denies the allegations contained in this paragraph.

## BACKGROUND OF THREATENED LITIGATION

8. Broadcom lacks sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and on that basis denies the same.

9. Broadcom admits that, in 2016, Avago Technologies Limited acquired Broadcom Corporation, and thereafter the combined company adopted the name Broadcom Limited. Broadcom further admits that, effective as of the close of trading on April 4, 2018, all issued ordinary shares of Broadcom Limited were exchanged on a one-for-one basis for newly issued shares of common stock of Broadcom Inc. Broadcom otherwise denies the allegations contained in this paragraph.

10. Broadcom admits that Avago Technologies International Sales Pte. Limited is an indirect subsidiary of Broadcom Inc. Broadcom otherwise denies the allegations contained in this paragraph.

11. Broadcom admits that, in October 2020, Avago Technologies International Sales Pte. Limited and BMW AG entered into a Settlement and Patent License Agreement, which speaks for itself. Broadcom otherwise denies the allegations contained in this paragraph.

12. Broadcom admits that, beginning on July 31, 2025, representatives of Avago Technologies International Sales Pte. Limited reached out to representatives of BMW AG to negotiate an extension to the Settlement and Patent License Agreement between Avago Technologies International Sales Pte. Limited and BMW AG, pursuant to Section 10.06 of that Settlement and Patent License Agreement. Broadcom otherwise denies the allegations contained in this paragraph.

13. Broadcom admits that, beginning on July 31, 2025, representatives of Avago Technologies International Sales Pte. Limited reached out to representatives of BMW AG to negotiate an extension to the Settlement and Patent License Agreement between Avago Technologies International Sales Pte. Limited and BMW AG, pursuant to Section 10.06 of that Settlement and Patent License Agreement. Broadcom further admits that, on October 9, 2025,

representatives of Avago Technologies International Sales Pte. Limited provided representatives of BMW AG a copy of a presentation titled "Broadcom Patent Licensing Proposal," which speaks for itself. Broadcom otherwise denies the allegations contained in this paragraph.

14. Broadcom admits that, on January 12, 2026, in connection with negotiations regarding an extension to the Settlement and Patent License Agreement between Avago Technologies International Sales Pte. Limited and BMW AG, representatives of Avago Technologies International Sales Pte. Limited provided representatives of BMW AG a list of patents, which included, *inter alia*, the '778 Patent. Broadcom otherwise denies the allegations contained in this paragraph.

15. Broadcom admits that, in connection with negotiations regarding an extension to the Settlement and Patent License Agreement between Avago Technologies International Sales Pte. Limited and BMW AG, representatives of Avago Technologies International Sales Pte. Limited provided representatives of BMW AG with information showing BMW AG's use of patented inventions of Avago Technologies International Sales Pte. Limited, including as relating to automotive Ethernet and Wi-Fi technologies. Broadcom otherwise denies the allegations contained in this paragraph.

16. Broadcom admits that, on March 20, 2026, in connection with negotiations regarding an extension to the Settlement and Patent License Agreement between Avago Technologies International Sales Pte. Limited and BMW AG, representatives of Avago Technologies International Sales Pte. Limited provided representatives of BMW AG exemplary presentations showing BMW AG's use of the following patents: EP 1 903 733 (Yu), US 7,936,778 (Ungerboeck), and US 10,447,431 (Shen). Broadcom admits that, on June 17, 2026, in connection with negotiations regarding an extension to the Settlement and Patent License Agreement between

Avago Technologies International Sales Pte. Limited and BMW AG, representatives of Avago Technologies International Sales Pte. Limited provided representatives of BMW AG exemplary presentations showing BMW AG's use of the following patents: DE 10 2016 001166 (Porat), DE 10 2016 007395 (Porat), EP 3 462 634 (Zheng), and EP 1 931 086 (Erceg). Each of these presentations speaks for itself. Broadcom otherwise denies the allegations contained in this paragraph.

17. As set forth in the Counterclaims herein, Avago Technologies International Sales Pte. Limited contends that BMW AG infringes at least one claim of each of the '389 Patent, '778 Patent, and '672 Patent. Broadcom otherwise denies the allegations contained in this paragraph.

18. Broadcom admits that, on March 20, 2026, in connection with negotiations regarding an extension to the Settlement and Patent License Agreement between Avago Technologies International Sales Pte. Limited and BMW AG, representatives of Avago Technologies International Sales Pte. Limited provided representatives of BMW AG an exemplary presentation showing BMW AG's use of EP 1 903 733 (Yu). This presentation speaks for itself. Broadcom further admits that, in order to protect its intellectual property rights, on June 11, 2026, Avago Technologies International Sales Pte. Limited initiated an infringement proceeding against BMW AG at the Landgericht München I, Docket No. 7 O 5786/26, with respect to European Patent No. EP 1 903 733 B1. Broadcom otherwise denies the allegations contained in this paragraph.

19. Broadcom admits that, on March 20, 2026, in connection with negotiations regarding an extension to the Settlement and Patent License Agreement between Avago Technologies International Sales Pte. Limited and BMW AG, representatives of Avago Technologies International Sales Pte. Limited provided representatives of BMW AG an exemplary

presentation showing BMW AG's use of US 7,936,778 (Ungerboeck). This presentation speaks for itself. Broadcom otherwise denies the allegations contained in this paragraph.

20. Broadcom admits that, on June 17, 2026, in connection with negotiations regarding an extension to the Settlement and Patent License Agreement between Avago Technologies International Sales Pte. Limited and BMW AG, representatives of Avago Technologies International Sales Pte. Limited provided representatives of BMW AG an exemplary presentation showing BMW AG's use of EP 1 931 086 (Erceg). This presentation speaks for itself. Broadcom further admits that, in order to protect its intellectual property rights, on August 5, 2026, Avago Technologies International Sales Pte. Limited initiated an infringement proceeding against BMW AG at the Landgericht München I, Docket No. 21 O 7936/26, with respect to European Patent No. EP 1 931 086. Broadcom otherwise denies the allegations contained in this paragraph.

21. Broadcom admits that, in view of BMW AG's unlicensed use of the patented inventions of Avago Technologies International Sales Pte. Limited, BMW AG is infringing the patented inventions of Avago Technologies International Sales Pte. Limited. Broadcom otherwise denies the allegations contained in this paragraph.

## JURISDICTION AND VENUE

22. Broadcom admits that this action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., and under the Patent Laws of the United States, 35 U.S.C. § 1, et seq. Broadcom admits that an actual case or controversy exists between BMW AG and Broadcom within the scope of this Court's jurisdiction pursuant to 28 U.S.C. § 2201. Broadcom otherwise denies the allegations contained in this paragraph.

23. Broadcom admits that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 2201–2202. Broadcom otherwise denies the allegations contained in this paragraph.

24. The website https://www.broadcom.com/company/contact/locations speaks for itself. Broadcom otherwise denies the allegations contained in this paragraph, including, but not limited to, BMW AG's allegation that 5465 Legacy Drive, Plano, Texas 75024 is a "location" of Broadcom Inc. as well as BMW AG's allegation that Broadcom Inc. "has employees at this location."

25. Denied.

26. Denied.

27. Denied.

28. Denied.

**PATENTS-IN-SUIT**

29. Admitted.

30. Admitted.

31. Admitted.

32. Broadcom admits that Avago Technologies International Sales Pte. Limited is the current owner of each of the '389 Patent, '778 Patent, and '672 Patent.

**COUNT I: DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. 7,835,389**

33. This paragraph does not contain factual allegations that require a response. To the extent that this paragraph is deemed to require a response, Broadcom incorporates by reference its responses to the foregoing paragraphs as if fully set forth herein.

34. As set forth in the Counterclaims herein, Avago Technologies International Sales Pte. Limited contends that BMW AG's vehicles supporting 100BASE-T1 technology, such as the BMW 3 Series, BMW 4 Series, and BMW X3 Series vehicles, infringe at least claim 1 of the '389 Patent. Broadcom otherwise denies the allegations contained in this paragraph.

35. Admitted.

36. Broadcom admits that, in order to protect its intellectual property rights, on June 11, 2026, Avago Technologies International Sales Pte. Limited initiated an infringement proceeding against BMW AG at the Landgericht München I, Docket No. 7 O 5786/26, with respect to European Patent No. EP 1 903 733 B1. Claim 1 of European Patent No. EP 1 903 733 speaks for itself. Claim 1 of the '389 Patent speaks for itself. Broadcom otherwise denies the allegations contained in this paragraph.

37. Denied.

38. Denied.

39. Denied.

40. Denied.

41. This paragraph does not contain factual allegations that require a response. To the extent that this paragraph is deemed to require a response, Broadcom denies the allegations of this paragraph.

**COUNT II: DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. 7,936,778**

42. This paragraph does not contain factual allegations that require a response. To the extent that this paragraph is deemed to require a response, Broadcom incorporates by reference its responses to the foregoing paragraphs as if fully set forth herein.

43. As set forth in the Counterclaims herein, Avago Technologies International Sales Pte. Limited contends that BMW AG's vehicles supporting 1000BASE-T1 technology, such as the BMW 3 Series, BMW 4 Series, and BMW X3 Series vehicles, infringe at least claim 1 of the '778 Patent. Broadcom otherwise denies the allegations contained in this paragraph.

44. Admitted.

45. Broadcom admits that, on March 20, 2026, in connection with negotiations regarding an extension to the Settlement and Patent License Agreement between Avago Technologies International Sales Pte. Limited and BMW AG, representatives of Avago Technologies International Sales Pte. Limited provided representatives of BMW AG an exemplary presentation showing BMW AG's use of US 7,936,778 (Ungerboeck). This presentation speaks for itself. Broadcom otherwise denies the allegations contained in this paragraph.

46. Denied.

47. Denied.

48. Denied.

49. Denied.

50. This paragraph does not contain factual allegations that require a response. To the extent that this paragraph is deemed to require a response, Broadcom denies the allegations of this paragraph.

**COUNT III: DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. 9,137,672**

51. This paragraph does not contain factual allegations that require a response. To the extent that this paragraph is deemed to require a response, Broadcom incorporates by reference its responses to the foregoing paragraphs as if fully set forth herein.

52. As set forth in the Counterclaims herein, Avago Technologies International Sales Pte. Limited contends that BMW AG's vehicles with at least Wi-Fi 4 capabilities or backwards compatibility with Wi-Fi 4 (such as Wi-Fi 5 and Wi-Fi 6), such as the BMW 5 Series, infringe at least claim 1 of the '672 Patent. Broadcom otherwise denies the allegations contained in this paragraph.

53. Admitted.

54. Broadcom admits that, in order to protect its intellectual property rights, on August 5, 2026, Avago Technologies International Sales Pte. Limited initiated an infringement proceeding against BMW AG at the Landgericht München I, Docket No. 21 O 7936/26, with respect to European Patent No. EP 1 931 086. Claim 1 of European Patent No. EP 1 931 086 speaks for itself. Claim 1 of the '672 Patent speaks for itself. Broadcom otherwise denies the allegations contained in this paragraph.

55. Denied.

56. Denied.

57. Denied.

58. Denied.

59. This paragraph does not contain factual allegations that require a response. To the extent that this paragraph is deemed to require a response, Broadcom denies the allegations of this paragraph.

## DEMAND FOR JURY TRIAL

BMW AG's jury demand does not require a response by Broadcom, but Broadcom admits that BMW AG demands a jury trial on all issues. Broadcom also demands a trial by jury.

## PRAYER FOR RELIEF

Broadcom denies that BMW AG is entitled to any relief whatsoever in this action, either as prayed for in the Complaint or otherwise.

## COUNTERCLAIMS

Counterclaim-Plaintiff Avago Technologies International Sales Pte. Limited ("Avago") brings these Counterclaims against Bayerische Motoren Werke Aktiengesellschaft ("BMW AG") for infringement of U.S. Patent Nos. 7,835,389 ("the '389 Patent"); 7,936,778 ("the '778 Patent"); 9,137,672 ("the '672 Patent"); 9,065,673 ("the '673 Patent"); 10,021,041 ("the '041 Patent"); and 11,025,364 ("the '364 Patent") (collectively, "the Counterclaim Patents"), and alleges as follows:

## NATURE OF ACTION

1. This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. § 271.

2. Avago brings this action to prevent BMW AG's continued knowing and willful infringement of Avago's patent rights. BMW AG has direct and extensive knowledge of Avago's patent rights, as well as knowledge that Avago's patented inventions were and are crucial components to the success of BMW AG's premium cars and other vehicles in the marketplace. Despite such knowledge, BMW AG has elected to willfully infringe upon Avago's patent rights. Avago accordingly brings the following Counterclaims to cease and abate such unlicensed infringement.

## THE PARTIES

3. Avago Technologies International Sales Pte. Limited is a corporation formed under the laws of Singapore with places of business at No. 1 Yishun Avenue 7, Singapore 768923 and 1320 Ridder Park Drive, San Jose, California 95131.

4. On information and belief, and based on BMW AG's assertions in this suit, BMW AG is a company organized and existing under the laws of Germany with a principal place of business at Petuelring 130, 80809 Munich, Germany.

5. BMW AG, together with its subsidiaries—to which the company refers collectively as "BMW Group"—"is the world's leading provider of premium cars and motorcycles and the home of the BMW, MINI, Rolls-Royce and BMW Motorrad brands."[1]

6. BMW AG is the "parent company of the BMW Group."[2] "The BMW Group comprises BMW AG itself and all subsidiaries over which BMW AG has either direct or indirect control."[3] "The BMW Group is subdivided into the Automotive, Motorcycles and Financial Services segments."[4] "BMW AG assumes central responsibility for the management of the Automotive, Motorcycles and Financial Services operating segments."[5]

7. "The BMW Group's global sales organisation includes sales companies and importers with representation in more than 140 countries. The sales system is structured as a multi-level sales model, where sales and customer support are handled in stages by BMW AG, its sales companies or importers, as well as sales partners."[6] The global sales network of the BMW Group's Automotive segment currently comprises around 3,400 BMW, over 1,600 MINI and 147 Rolls-Royce establishments. "The BMW Group's most lucrative automobile markets in the reporting year 2025" include "the USA."[7]

---

[1] https://www.bmwgroup.com/en/company.html; https://www.bmwgroup.com/en.html.
[2] *BMW Group Report 2025*, at 38.
[3] *BMW Group Report 2025*, at 38.
[4] *BMW Group Report 2025*, at 38.
[5] *BMW Group Report 2025*, at 38.
[6] *BMW Group Report 2025*, at 38.
[7] *BMW Group Report 2025*, at 39.

## JURISDICTION

8. This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this case arises under the patent laws of the United States, Title 35 of the United States Code.

9. This Court has personal jurisdiction over BMW AG because BMW AG has, directly or through subsidiaries, intermediaries, and/or agents it controls, committed acts within the State of Texas, including within this District, giving rise to this action and/or has established minimum contacts with the State of Texas and this District such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. For example, BMW AG, directly or through subsidiaries, intermediaries, and/or agents it controls, conducts substantial business in the State of Texas and in this District, including (1) committing at least a portion of the infringing acts alleged herein and (2) regularly transacting business, soliciting business, and deriving revenue from the sale of goods and services, including infringing goods and services, to individuals in the State of Texas, including within this District. Thus, BMW AG has purposefully availed itself of the benefits of the State of Texas, and the exercise of jurisdiction over BMW AG would not offend traditional notions of fair play and substantial justice.

10. On information and belief, BMW AG manufactures its vehicles, including the infringing products identified herein, for importation, offer for sale, and sale throughout the United States, the State of Texas, and this District.[8] BMW AG has "central responsibility" for the BMW Group's Automotive operating segment.[9] And "BMW AG has either direct or indirect control" over all of its subsidiaries in the BMW Group.[10]

---

[8] https://www.bmwgroup.com/en.html.
[9] *BMW Group Report 2025*, at 38.
[10] *BMW Group Report 2025*, at 38.

11. The "sales system" of the BMW Group is "structured as a multi-level sales model, where sales and customer support are handled in stages by BMW AG, its sales companies or importers, as well as sales partners."[11] And BMW AG has authorized sales companies, sales partners, and sales representatives that offer for sale and sell BMW AG's vehicles, including the infringing products identified herein, throughout the State of Texas and to consumers throughout this District, including, on information and belief, at the following locations in this District: BMW of Tyler, 2401 W SW Loop 323, Tyler, TX 75701; BMW of McKinney, 2601 N Central Expy, McKinney, TX 75071; and BMW of Plano, 6800 Dallas Pkwy, Plano, TX 75024. On information and belief, each of these locations is part of the "global sales network of the BMW Group's Automotive segment," over which BMW AG has "central responsibility."[12]

12. Based on BMW AG's connections and relationships with these sales companies, sales partners, and sales representatives, BMW AG knows that Texas is a termination point of its established distribution channels, including via physical stores offering BMW AG's vehicles to users in Texas. BMW AG therefore has purposefully directed its activities at the State of Texas, and should reasonably anticipate being brought before this Court.

13. Additionally, on information and belief, BMW AG also offers for sale and sells, directly or through agents and/or intermediaries it controls, its vehicles, including the infringing products identified herein, through its websites, which may be accessed throughout the United States, the State of Texas, and this District.[13] BMW AG has therefore purposefully directed its activities at the State of Texas, and should reasonably anticipate being brought before this Court.

---

[11] *BMW Group Report 2025*, at 38.
[12] *BMW Group Report 2025*, at 38.
[13] https://www.bmwgroup.com/en/general/contact.html; *see, e.g.*, https://www.bmwusa.com/.

14. In addition to acts of direct and indirect infringement as described throughout this Counterclaim, BMW AG has induced, and continues to induce, its subsidiaries, affiliates, shippers, retail partners, and customers to make, use, offer for sale, sell, and/or import in or for the United States, including within this District, its vehicles, including the infringing products identified herein, and places such products into the stream of commerce via established distribution channels, knowing or understanding that such products would be imported, sold, and used in the United States and that such products infringe the Counterclaim Patents, including within this District. Indeed, as set forth above, BMW AG purposefully directs its premium cars and other vehicles, including the infringing products identified herein, into established distribution channels within the United States, the State of Texas, and this District.[14]

15. For example, BMW AG has committed acts of indirect infringement at least by manufacturing products for the United States market, and/or directing them to the United States market, knowing they will cause infringement through import, offer for sale, sale, and/or use in the United States.[15]

16. Additionally, BMW AG has purposefully availed itself of the benefits of the State of Texas, and the exercise of jurisdiction over BMW AG would not offend traditional notions of fair play and substantial justice, because BMW AG has purposefully availed itself of this District via BMW AG's Complaint in the present suit, which seeks a declaratory judgment that BMW AG does not infringe U.S. patents owned by Avago. By filing the Complaint in the present suit, BMW AG has waived any objection it might otherwise have on grounds of personal jurisdiction to the Counterclaims presented against BMW AG herein.

---

[14] *See BMW Group Report 2025*, at 38.
[15] *See BMW Group Report 2025*, at 38; https://www.bmwgroup.com/en.html.

17. In the alternative, this Court has personal jurisdiction over BMW AG under Federal Rule of Civil Procedure 4(k)(2), because the claims for patent infringement in this action arise under federal patent law, BMW AG is not subject to the jurisdiction of the courts of general jurisdiction of any state, and exercising jurisdiction over BMW AG is consistent with the United States Constitution. Indeed, this action arises from actions of BMW AG directed toward the United States, including (1) committing at least a portion of the infringing acts alleged herein and (2) regularly transacting business, soliciting business, and deriving revenue from the sale of goods and services, including infringing goods and services, to individuals in the United States. Therefore, BMW AG has purposefully availed itself of the benefits of the United States, including this District, and the exercise of jurisdiction over BMW AG would not offend traditional notions of fair play and substantial justice.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391(c), as BMW AG is not a resident of the United States and thus may be sued in any judicial district pursuant to 28 U.S.C. § 1391(c)(3).

19. Additionally, venue is proper in this District because BMW AG has purposefully availed itself of this District via BMW AG's Complaint in the present suit, which seeks a declaratory judgment that BMW AG does not infringe U.S. patents owned by Avago. By filing the Complaint in the present suit, BMW AG has waived any objection it might otherwise have on grounds of venue to the Counterclaims presented against BMW AG herein.

## **BACKGROUND**

20. Avago is an indirect subsidiary of Broadcom Inc. ("Broadcom"), a global infrastructure technology leader built on over fifty years of innovation, collaboration, and engineering excellence. The company traces its roots to the pioneering innovations of leading

companies like AT&T/Bell Labs, Lucent Technologies, and Hewlett-Packard/Agilent. In recent years, Broadcom has continued to broaden its technology base into additional areas that connect the world by combining with other industry leaders like LSI, Brocade, CA Technologies, Symantec, and VMware.

21. The companies that have united to further Broadcom's technology leadership, like Avago, recognize that continued success depends in substantial part on their continuous innovation and attention to research and development. Through its subsidiaries, Broadcom spends billions of dollars each year on product research and development, including spending $10,977,000,000 on product research and development in the 2025 fiscal year alone, for example, per its annual report. Of the approximately 33,000 employees of Broadcom's subsidiaries worldwide (as of the end of the 2025 fiscal year), more than half work in research and development. These efforts have produced a wide range of novel technologies and inventions directed to advancing, among other things, semiconductor design, digital communications, digital content distribution, enterprise and data center networking, home connectivity, television set-top boxes, infrastructure software, and other inventions that provide important advancements in technology not only within the United States, but throughout the world. For example, the Broadcom group is an industry leader in Automotive Ethernet chips, among many other products, offering a comprehensive product portfolio for Automotive Ethernet PHYs, Switches, and Microcontrollers.

22. Like most technology innovators, Broadcom and its subsidiaries, such as Avago, rely on the patent systems of the United States and foreign countries to ensure that the innovations developed through their research-and-development efforts are protected from unauthorized use by others. Collectively, these companies hold thousands of patents around the world.

23. BMW AG, together with its subsidiaries, is one of the world's leading providers of premium vehicles, including in the United States, and the home of the BMW, MINI, Rolls-Royce, and BMW Motorrad brands.

24. In or around 2007, BMW AG's engineers began investigating the use of Ethernet-based communication, including the use of standard 100BASE-TX Ethernet, in BMW AG vehicles. BMW AG's engineers, however, encountered problems in such implementation, which, by BMW AG's own admissions, it "could not solve."[16]

25. Thus, in 2007, BMW AG's engineers contacted various well-established Ethernet semiconductor suppliers—including Broadcom—to provide their opinions and solutions. Of the suppliers solicited by BMW AG, only Broadcom responded positively. Indeed, two of the other suppliers "thought the BMW request impossible."[17]

26. Broadcom, however, achieved the "impossible." In particular, Broadcom engineers developed a solution that achieved 100 Mbps Ethernet transmission over unshielded twisted pair cables in the harsh automotive electromagnetic compatibility (EMC) conditions. This, among other things, facilitated increases in data throughput and reduction in both cabling weight and cost in automotive networking. In BMW AG's own words: "This was when Automotive Ethernet was born."[18]

---

[16] Matheus, K., *Automotive Ethernet* 3rd ed., Cambridge University Press, 2021 ("*Automotive Ethernet*"), at xv–xvi, 85–86.
[17] *Automotive Ethernet* at xv–xvi, 85–86.
[18] *Automotive Ethernet* at xv–xvi, 85–86.

27. This Broadcom technology became known as "BroadR-Reach," a name derived from "Broadcom."[19] And BMW AG itself has stated: "With BroadR-Reach, the door opener to Automotive Ethernet was found."[20]

28. As expressly acknowledged by BMW AG and its engineers, "[t]he BroadR-Reach technology was developed by Broadcom, who also own the respective Intellectual Property Rights (IPR) on the technology."[21]

29. Recognizing the necessity of Broadcom's technology with respect to BMW AG's vehicles, BMW AG took a license to Broadcom's patented technology.

30. In October 2020, BMW AG, on behalf of itself and its Affiliates, entered into a Settlement and Patent License Agreement ("the Agreement") with Avago, on behalf of itself and its Affiliates, including Broadcom Inc. By the terms of the Agreement, including in view of consideration provided by BMW AG, Avago granted to BMW AG under the AVAGO LICENSED PATENTS a worldwide, personal, nonexclusive, and non-transferable license to make, have made, use, offer, sell, put on the market, lease, import or export LICENSED PRODUCTS.

31. The license granted by Avago under the Agreement was set to expire—and ultimately did expire—on June 30, 2026.

32. Failure to renew the patent license granted in the Agreement would require BMW AG to either cease use of critical technology patented by Broadcom or willfully infringe upon Broadcom's patent rights. Thus, Avago and BMW AG agreed to meet in person prior to the end of the license to negotiate an extension to the patent license granted in the Agreement, with the goal of executing such extension prior to the end of the original license.

---

[19] *See Automotive Ethernet* at xv–xvi, 85–86.
[20] *Automotive Ethernet* at xv–xvi, 85–86.
[21] *Automotive Ethernet* at 92–93.

33. On July 31, 2025, representatives of Avago reached out to representatives of BMW AG to schedule an in-person meeting to negotiate an extension of the Agreement's patent license. And an initial meeting between the parties took place in October 2025, during which representatives of Avago presented BMW AG with a licensing renewal offer that would allow BMW AG to continue using Broadcom's patented technology.

34. BMW AG did not accept Avago's licensing renewal offer, despite BMW AG's own previous statements regarding the fundamental nature of Broadcom's technology and intellectual property rights.

35. In view of BMW AG's refusal to renew the Agreement, representatives of Avago provided representatives of BMW AG documents and other information showing BMW AG's use of various intellectual property rights owned by Avago in BMW AG's vehicles.

36. For example, on January 12, 2026, representatives of Avago provided representatives of BMW AG a list of patents relevant to BMW AG and its vehicles, including, but not limited to, the '778 Patent, the '673 Patent, the '041 Patent, and the '364 Patent.

37. Additionally, on March 20, 2026, representatives of Avago provided representatives of BMW AG exemplary presentations showing BMW AG's use of the following patents: EP 1 903 733 (Yu), US 7,936,778 (Ungerboeck), and US 10,447,431 (Shen).

38. The March 20, 2026, presentation with respect to EP 1 903 733 (Yu) showed the practice of claim 1 of European Patent No. EP 1 903 733 by an exemplary BMW AG product and identified the '389 Patent as a related "Family Member." In this suit, BMW AG avers that "[a]t least claim 1 of the '389 Patent is nearly identical to the example patent claim identified as the infringed claim in this infringement presentation."

39. The March 20, 2026, presentation with respect to US 7,936,778 (Ungerboeck) showed the practice of claim 1 of the ’778 Patent by an exemplary BMW AG product.

40. The March 20, 2026, presentation with respect to US 10,447,431 (Shen) showed the practice of claim 1 of U.S. Patent No. 10,447,431, the parent of the ’364 Patent, by an exemplary BMW AG product and identified the ’364 Patent as a related “Family Member.”

41. Additionally, on June 17, 2026, representatives of Avago provided representatives of BMW AG exemplary presentations showing BMW AG’s use of the following patents: DE 10 2016 001166 (Porat), DE 10 2016 007395 (Porat), EP 3 462 634 (Zheng), and EP 1 931 086 (Erceg).

42. The June 17, 2026, presentation with respect to EP 1 931 086 (Erceg) showed the practice of claim 1 of European Patent No. EP 1 931 086 by an exemplary BMW AG product and identified the ’672 Patent as a related “Family Member.” In this suit, BMW AG avers that “[a]t least claim 1 of the ’672 Patent is nearly identical to the example patent claim identified as the infringed claim in this infringement presentation.”

43. Despite these showings that BMW AG was using Broadcom’s patented technology, BMW AG did not cease its infringing activities. BMW AG is, accordingly, willfully and intentionally incorporating and utilizing Broadcom’s patented inventions in BMW AG’s vehicles without a license.

**COUNT I**
**(Infringement of U.S. Patent No. 7,835,389)**

44. Avago realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

45. United States Patent No. 7,835,389 (“the ’389 Patent”) is titled “Method and System for an Extended Range Ethernet Line Code Using 4B/3B Mapping,” and was duly and

legally issued by the United States Patent and Trademark Office on November 16, 2010. The term of the ’389 Patent has not expired. The ’389 Patent is valid and enforceable. A copy of the ’389 Patent is attached as **Exhibit A**.

46. The ’389 Patent is directed to “high-speed wired communication,” and provides a key solution to a challenge in high-speed wired communication: the “growing need for new transmission technologies enabling higher transmission rates over existing copper cable cabling infrastructure” to accommodate the increasing “number of devices connected to data networks.” ’389 Patent, at 1:17–28.

47. The ’389 Patent explains that conventional and traditional efforts and approaches to enable higher transmission rates over existing cabling infrastructures suffer many “limitations and disadvantages.” ’389 Patent, at 1:66–2:3. For example, the ’389 Patent explains that known technologies for enabling higher transmission rates over existing cabling are limited to “twisted-pair copper cabling 100 m in length.” ’389 Patent, at 1:27–35. The ’389 Patent explains that, while emerging technology for development of a standard for 10 Gbps Ethernet transmission over twisted-pair cabling may enable such connections over twisted-pair cabling, it will require “elaborate digital signal processing techniques” to “remove or reduce the effects of severe frequency-dependent signal attenuation, signal reflections, near-end and far-end crosstalk between the four pairs, and external signals coupled into the four pairs either from adjacent transmission links or other external noise sources.” ’389 Patent, at 1:41–54.

48. The ’389 Patent thus explains that “[e]xtending the range or distance at which standard based Ethernet PHY devices may operate with minimal changes to the PHY transceiver architectures that support, for example, 1 Gbps or 10 Gbps data rates, may enable new Ethernet

PHY devices to be used and deployed in the broadband access market and possibly in new residential and enterprise applications." '389 Patent, at 1:57–63.

49. The '389 Patent describes technological systems and methods that solve the technological problems described in the specification of the '389 Patent and are directed to a concrete improvement in Ethernet networking technology. For example, "[c]ertain embodiments of the invention may be found in a method and system for an extended range Ethernet line code," which, "[f]or extended range applications," "may operate so as to slow down the line rate in order to support longer or extended cable ranges." '389 Patent, at 3:7–8, 3:24–26. "In this regard, the redundancy of the lines codes may be minimized in order to extend the ranges of operation." '389 Patent, at 3:26–28. "Aspects of the invention may comprise a local PHY that may enable converting Ethernet media independent interface (MII) data from a 4-bit packet stream to a 3-bit packet stream. The 3-bit packet streams may be mapped to first and second ternary bit streams for communication to a remote PHY utilizing PAM-3 over one or more twisted-pair wires." '389 Patent, at 3:9–14. The '389 Patent further describes that "[t]he 3-bit packet stream may be scrambled and/or aligned before mapping." '389 Patent, at 3:16–17. And "utilizing a PAM-3 scheme for transmission over each wire pair may enable the appropriate level of redundancy and signal-to-noise ratio (SNR)." '389 Patent, at 3:28–31.

50. The claims of the '389 Patent are directed to the enhanced processing and transmission techniques described in the '389 Patent. For example, claim 1 of the '389 Patent recites "[a] method for wired communication" that includes "converting Ethernet media independent interface (MII) data in a local physical layer device from a 4-bit packet stream to one or more data packet portions of one or more ternary bit streams;" "mapping 3-bit binary IDLE patterns to one or more IDLE portions of said one or more ternary bit streams, wherein 3-bit binary

IDLE patterns having a least significant bit of zero are mapped to a non-zero value of said one or more ternary bit streams, and 3-bit binary IDLE patterns having a non-zero least significant bit are mapped to a zero value of said one or more ternary bit streams;" and "communicating said one or more ternary bit streams to a remote PHY over one or more twisted pairs."

51. The claims of the '389 Patent are thus not directed toward fundamental economic practices, methods of organizing human activities, an abstract idea itself, or mathematical formulas. Rather, the claims of the '389 Patent are directed to a specific area of application, an enhanced Ethernet PHY device that converts 4-bit media independent interface (MII) data into ternary bit streams, maps 3-bit binary IDLE patterns to ternary values according to a specific least-significant-bit rule, and sends the resulting streams to a remote PHY over one or more twisted pairs.

52. The claims of the '389 Patent also recite more than generic computer functionality and recite steps that were not conventional as of the priority date of the '389 Patent. The claims of the '389 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "converting Ethernet media independent interface (MII) data in a local physical layer device from a 4-bit packet stream to one or more data packet portions of one or more ternary bit streams;" and "mapping 3-bit binary IDLE patterns to one or more IDLE portions of said one or more ternary bit streams, wherein 3-bit binary IDLE patterns having a least significant bit of zero are mapped to a non-zero value of said one or more ternary bit streams, and 3-bit binary IDLE patterns having a non-zero least significant bit are mapped to a zero value of said one or more ternary bit streams."

53. The claims of the '389 Patent, either alone or as an ordered combination, thus recite improvements over prior art and conventional systems and methods and represent meaningful

limitations and/or inventive concepts. Further, in view of these specific improvements, the claims of the ’389 Patent, when such claims are viewed as a whole and in ordered combination, were not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical as of the priority date of the ’389 Patent.

54. Avago is the owner and assignee of all substantial rights in the ’389 Patent. As such, Avago has standing to sue and the right to recover damages for the infringement of the ’389 Patent and pursue any and all causes of action and remedies, whether legal or equitable, related thereto.

55. On information and belief, since July 1, 2026, BMW AG, without license or Avago’s authority, has been making, using, offering to sell, selling, and importing, and continues to make, use, offer to sell, sell, and import, in the United States products that directly infringe one or more claims of the ’389 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents. For example, as shown in the exemplary claim chart attached as **Exhibit A1**, which is hereby incorporated by reference as if fully set forth herein, BMW AG’s vehicles supporting implementation of 100BASE-T1 automotive Ethernet links (“the ’389 Accused Products”), including, but not limited to, BMW 3 Series, BMW 4 Series, BMW 5 Series, and BMW X3 Series vehicles, satisfy each limitation of at least claim 1 of the ’389 Patent.

56. Indeed, in February 2026, the Munich Regional Court found that another automaker, Renault, infringed European Patent No. EP 1 903 733—the European counterpart of the ’389 Patent—through its vehicles equipped with 100BASE-T1 automotive Ethernet chips. The Munich Regional Court held that “the 100-BASE-T1 standard makes use of the teaching of the patent in suit with regard to all features,” including the claimed mapping of 3-bit IDLE patterns—the very limitation that BMW AG alleges its vehicles do not practice as a result of implementation

of the 100BASE-T1 standard. Moreover, BMW AG concedes that "[c]laim 1 of the '389 Patent and claim 1 of this patent's European counterpart patent have the same limitations."

57. Since at least March 20, 2026, BMW AG has known of the '389 Patent and that its vehicles infringe claims of the '389 Patent, yet BMW AG has nevertheless continued its infringement and unlawful actions since July 1, 2026. Indeed, on March 20, 2026, representatives of Avago provided representatives of BMW AG a presentation showing the practice of claim 1 of European Patent No. EP 1 903 733 by an exemplary BMW AG product and identified the '389 Patent as a related "Family Member." And in this suit, BMW AG avers that "[a]t least claim 1 of the '389 Patent is nearly identical to the example patent claim identified as the infringed claim in this infringement presentation." In addition and in the alternative, by at least the date on which this Counterclaim was filed, BMW AG has known of the '389 Patent and that its vehicles infringe claims of the '389 Patent, yet BMW AG has nevertheless continued its infringement and unlawful actions.

58. On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, BMW AG has actively, knowingly, and intentionally induced infringement of one or more claims of the '389 Patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell the '389 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, BMW AG has actively promoted the importation, sale, and use of the '389 Accused Products in marketing materials and on BMW AG's website as well as at trade shows and through its sales and distribution channels that encourage infringing importation of, offers to sell, sales, and uses of the '389 Accused Products, including, for example, in Owner's Manuals and marketing materials for the '389 Accused Products, which include instructions and

illustrations that induce infringement of one or more claims of the ’389 Patent.[22] BMW AG also manufactured the ’389 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, BMW AG has had knowledge of the ’389 Patent and its infringement thereof since at least March 20, 2026, and either knew that the induced acts constituted patent infringement or, alternatively, was willfully blind to the infringement.

59. On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, BMW AG has contributorily infringed and continues to contributorily infringe one or more claims of the ’389 Patent by offering to sell, selling, and/or importing into the United States material components of the ’389 Accused Products that constitute a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the ’389 Patent, and which are not a staple article or commodity of commerce suitable for substantial non-infringing use.

60. Avago has been and continues to be injured by BMW AG’s infringement of the ’389 Patent. Avago is entitled to recover damages adequate to compensate it for BMW AG’s infringing activities in an amount to be determined at trial, including lost profits but in no event less than a reasonable royalty.

61. BMW AG’s acts of infringement of the ’389 Patent have been committed and are being committed with full knowledge of Avago’s patent rights and full knowledge of infringement.

---

[22] *E.g.*, Matheus, K., *Automotive Ethernet* 3rd ed., Cambridge University Press, 2021. https://www.bmwgroup.com/en/innovation/connected-car.html (as of at least July 11, 2026: “The new BMW Operating Systems 8.5 and 9 are our latest infotainment systems. … [T]hey bring together the latest generation of displays, controls and software as well as high-performance 5G connectivity and Gigabit Ethernet data processing to offer an exhilarating experience. With their drive-focused, intuitive operations and their wide-ranging entertainment offering – which includes in-car gaming and video streaming – the two systems successfully combine practical advantages with digital entertainment.”).

On information and belief, and for at least the reasons discussed above, BMW AG could not reasonably or subjectively have believed that its actions do not or did not constitute infringement of the ’389 Patent, nor could it reasonably or subjectively have believed that the patent is invalid. Despite that knowledge and subjective belief, BMW AG continued its infringing activities. BMW AG’s directly and indirectly infringing acts constitute willful, intentional, and deliberate infringement, entitling Avago to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys’ fees and costs.

62. Unless enjoined by this Court, BMW AG’s acts of infringement will continue to damage and cause irreparable harm to Avago.

**COUNT II**
**(Infringement of U.S. Patent No. 7,936,778)**

63. Avago realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

64. United States Patent No. 7,936,778 (“the ’778 Patent”) is titled “Method and System for 10GBASE-T Start-Up,” and was duly and legally issued by the United States Patent and Trademark Office on May 3, 2011. The term of the ’778 Patent has not expired. The ’778 Patent is valid and enforceable. A copy of the ’778 Patent is attached as **Exhibit B**.

65. The ’778 Patent is directed to “training” Ethernet transceivers for twisted-pair cabling during a start-up procedure, and provides a key solution to a challenge in high-speed wired communication: the “growing need for new transmission technologies enabling higher transmission rates over existing copper cable cabling infrastructure” to accommodate the increasing “number of devices connected to data networks.” ’778 Patent, at 1:25–37.

66. For example, the ’778 Patent describes a “current effort” toward enabling higher transmission rates over existing copper cable cabling infrastructure. ’778 Patent, at 1:37–39. The

’778 Patent explains that “[a] pair of [] transceivers on each side of a link must initially be trained during a start-up procedure to adapt transmitter and receiver settings to the specific characteristics of the link.” ’778 Patent, at 1:53–56. The ’778 Patent notes this start-up procedure “may include establishing initial synchronization, setting transmit power levels, adjusting echo and near-end crosstalk cancellers, adjusting equalizers, selecting and exchanging precoding coefficients, etc.” ’778 Patent, at 1:56–60.

67. The ’778 Patent explains that “start-up procedures [] known in the art” suffer many “limitations and disadvantages” in the context of emerging technology. ’778 Patent, at 1:60–2:14. For example, “[s]ome start-up procedures are aimed at achieving relatively short start-up times,” and, “[f]or lower-rate PHY transceivers …, real-time execution of start-up specific functions meeting the requirements of time-critical handshake procedures usually did not pose severe problems.” ’778 Patent, at 1:61–66. The ’778 Patent explains, “where start-up time may not be a critical issue, minimizing the means required for accomplishing start-up specific functions may be more important. Hence there is a need for a start-up procedure that permits performing such functions by shared hardware, firmware, or software at far less than real-time speed in exchange for a longer start-up time. Then only functions needed for sustained continuous data transmission, such as long digital filters or decoders for error correction decoding, must be realized by highly efficient hardware that can perform these functions in real time.” ’778 Patent, at 1:66–2:9.

68. The ’778 Patent describes technological systems and methods that solve the technological problems described in the specification of the ’778 Patent and are directed to a concrete improvement in Ethernet networking technology. For example, the ’778 Patent describes embodiments wherein a start-up procedure is characterized by an initial Physical Medium Attachment (PMA) training period, wherein “long PMA training frames are periodically

transmitted" over twisted-pair copper cables connecting transceivers. '778 Patent, at 2:52–3:2. "Each PMA training frame consists of a known pseudo random sequence of binary modulation symbols." '778 Patent, at 3:4–5. "Knowledge of the periodically transmitted binary sequences enables the receiver sections of the link partners to acquire and maintain symbol timing and PMA frame synchronization throughout the entire PMA training period. For other purposes the known long sequences exhibit the characteristics of essentially random sequences." '778 Patent, at 3:15–20. "Thus resources needed for performing a variety of start-up specific functions can be allocated in transceivers with great flexibility and without stringent real-time requirements." '778 Patent, at 3:39–41.

69. The claims of the '778 Patent are directed to the enhanced training and start-up procedures described in the '778 Patent. For example, claim 1 of the '778 Patent recites "[a] method for setting up communication devices, the method comprising: exchanging physical medium attachment (PMA) training frames periodically between link partners during a training period, wherein a majority portion of each of said PMA training frames is comprised of pseudo random known sequences which are used for establishing transceiver operations for communication between said link partners, and wherein said link partners are communicatively coupled via a wired Ethernet link."

70. The claims of the '778 Patent are thus not directed toward fundamental economic practices, methods of organizing human activities, an abstract idea itself, or mathematical formulas. Rather, the claims of the '778 Patent are directed to a specific area of application, exchanging physical medium attachment (PMA) training frames periodically between Ethernet link partners during a training period, wherein a majority portion of each of said PMA training

frames is comprised of pseudo random known sequences which are used for establishing transceiver operations for communication between said link partners.

71. The claims of the ’778 Patent also recite more than generic computer functionality and recite steps that were not conventional as of the priority date of the ’778 Patent. The claims of the ’778 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: “exchanging physical medium attachment (PMA) training frames periodically between link partners during a training period, wherein a majority portion of each of said PMA training frames is comprised of pseudo random known sequences which are used for establishing transceiver operations for communication between said link partners, and wherein said link partners are communicatively coupled via a wired Ethernet link.”

72. The claims of the ’778 Patent, either alone or as an ordered combination, thus recite improvements over prior art and conventional systems and methods and represent meaningful limitations and/or inventive concepts. Further, in view of these specific improvements, the claims of the ’778 Patent, when such claims are viewed as a whole and in ordered combination, were not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical as of the priority date of the ’778 Patent.

73. Avago is the owner and assignee of all substantial rights in the ’778 Patent. As such, Avago has standing to sue and the right to recover damages for the infringement of the ’778 Patent and pursue any and all causes of action and remedies, whether legal or equitable, related thereto.

74. On information and belief, since July 1, 2026, BMW AG, without license or Avago’s authority, has been making, using, offering to sell, selling, and importing, and continues to make, use, offer to sell, sell, and import, in the United States products that directly infringe one

or more claims of the ’778 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents. For example, as shown in the exemplary claim chart attached as **Exhibit B1**, which is hereby incorporated by reference as if fully set forth herein, BMW AG’s vehicles supporting implementation of 1000BASE-T1 automotive Ethernet links (“the ’778 Accused Products”), including, but not limited to, BMW 2 Series, BMW 3 Series, BMW 4 Series, BMW 5 Series, BMW 7 Series, BMW X1 Series, BMW X2 Series, BMW X3 Series, BMW X5 Series, BMW X6 Series, BMW X7 Series, BMW i3 Series, BMW i5 Series, BMW i7 Series, BMW XM Series, BMW iX3 Series, and BMW M Model vehicles, satisfy each limitation of at least claim 1 of the ’778 Patent.

75. Since at least March 20, 2026, BMW AG has known of the ’778 Patent and that its vehicles infringe claims of the ’778 Patent, yet BMW AG has nevertheless continued its infringement and unlawful actions since July 1, 2026. Indeed, on March 20, 2026, representatives of Avago provided representatives of BMW AG a presentation showing the practice of claim 1 of the ’778 Patent by an exemplary BMW AG product. In addition and in the alternative, by at least the date on which this Counterclaim was filed, BMW AG has known of the ’778 Patent and that its vehicles infringe claims of the ’778 Patent, yet BMW AG has nevertheless continued its infringement and unlawful actions.

76. On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, BMW AG has actively, knowingly, and intentionally induced infringement of one or more claims of the ’778 Patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell the ’778 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, BMW AG has actively promoted the importation, sale, and use of the ’778

Accused Products in marketing materials and on BMW AG's website as well as at trade shows and through its sales and distribution channels that encourage infringing importation of, offers to sell, sales, and uses of the '778 Accused Products, including, for example, in Owner's Manuals and marketing materials for the '778 Accused Products, which include instructions and illustrations that induce infringement of one or more claims of the '778 Patent.[23] BMW AG also manufactured the '778 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, BMW AG has had knowledge of the '778 Patent and its infringement thereof since at least March 20, 2026, and either knew that the induced acts constituted patent infringement or, alternatively, was willfully blind to the infringement.

77. On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, BMW AG has contributorily infringed and continues to contributorily infringe one or more claims of the '778 Patent by offering to sell, selling, and/or importing into the United States material components of the '778 Accused Products that constitute a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the '778 Patent, and which are not a staple article or commodity of commerce suitable for substantial non-infringing use.

78. Avago has been and continues to be injured by BMW AG's infringement of the '778 Patent. Avago is entitled to recover damages adequate to compensate it for BMW AG's

---

[23] *E.g.*, https://www.bmwgroup.com/en/innovation/connected-car.html (as of at least July 11, 2026: "The new BMW Operating Systems 8.5 and 9 are our latest infotainment systems. … [T]hey bring together the latest generation of displays, controls and software as well as high-performance 5G connectivity and Gigabit Ethernet data processing to offer an exhilarating experience. With their drive-focused, intuitive operations and their wide-ranging entertainment offering – which includes in-car gaming and video streaming – the two systems successfully combine practical advantages with digital entertainment.").

infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

79. BMW AG's acts of infringement of the '778 Patent have been committed and are being committed with full knowledge of Avago's patent rights and full knowledge of infringement. On information and belief, and for at least the reasons discussed above, BMW AG could not reasonably or subjectively have believed that its actions do not or did not constitute infringement of the '778 Patent, nor could it reasonably or subjectively have believed that the patent is invalid. Despite that knowledge and subjective belief, BMW AG continued its infringing activities. BMW AG's directly and indirectly infringing acts constitute willful, intentional, and deliberate infringement, entitling Avago to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

80. Unless enjoined by this Court, BMW AG's acts of infringement will continue to damage and cause irreparable harm to Avago.

**COUNT III**
**(Infringement of U.S. Patent No. 9,137,672)**

81. Avago realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

82. United States Patent No. 9,137,672 ("the '672 Patent") is titled "Method and System for Coexistence Between 20 MHz and 40 MHz Overlapping Basic Service Sets (OBSS) in Wireless Local Area Networks," and was duly and legally issued by the United States Patent and Trademark Office on September 15, 2015. The term of the '672 Patent has not expired. The '672 Patent is valid and enforceable. A copy of the '672 Patent is attached as **Exhibit C**.

83. The ’672 Patent is directed to “communication networks,” and provides a key solution with respect to coexistence between “overlapping basis service sets (OBSS) in wireless local area networks.” ’672 Patent, at 1:22–26.

84. The ’672 Patent explains: “IEEE 802.11 describes a communication architecture, which may enable computing devices to communicate via wireless local area networks (WLANs). One of the building blocks for the WLAN is the basic service set (BSS). A BSS may comprise a plurality of computing devices, or stations (STA), which may communicate wirelessly via one or more RF channels within a coverage area. The span of a coverage area may be determined based on the distance over which a source STA may transmit data via an RF channel, which may be received by a destination STA.” ’672 Patent, at 1:30–39.

85. The ’672 Patent further explains that STAs within a BSS “may negotiate operating parameters, which the STAs may utilize to enable communications with other STAs within the BSS.” ’672 Patent, at 1:61–63. “The operating parameters may include determination of an RF channel bandwidth that is to be utilized between communicating STAs. An RF channel utilized for communication between STAs may utilize a 20 MHz bandwidth or a 40 MHz bandwidth. … Each RF channel may comprise a distinct range of frequencies as determined by applicable IEEE 802.11 specifications. A 20 MHz RF channel may comprise a single 20 MHz channel. A 40 MHz RF channel may comprise a 20 MHz primary channel and a 20 MHz secondary channel.” ’672 Patent, at 1:63–2:8. “The operating parameters may also include specification of a modulation method that is to be utilized by STAs when transmitting data via the assigned RF channel. For example, a STA, for which communications are based on IEEE 802.11g specifications may utilize complementary code keying (CCK) modulation when transmitting data via an RF channel, while a STA, for which communications are based on IEEE 802.11n specifications may utilize

orthogonal frequency division multiplexing (OFDM) when transmitting data via an RF channel." '672 Patent, at 2:9–17.

86. The '672 Patent further explains that "STAs, which utilize IEEE 802.11 specifications may utilize a collision sense multiple access with collision avoidance (CSMA/CA) method to gain access to the wireless medium." '672 Patent, at 2:18–20. The '672 Patent, however, notes: "Collisions may occur in a wireless communication medium when multiple STAs, within an RF transmission coverage area, concurrently utilize overlapping RF channel(s) in an attempt to transmit data. RF channels may overlap when at least one frequency is common between two or more of the concurrently overlapping RF channels." '672 Patent, at 2:21–26; *see* '672 Patent, at 2:30–43. The '672 Patent explains that such "[c]ollisions may result in unsuccessful transfer of data via the wireless communication medium, which may in turn result in reduced data transfer rates for data transmitted by the STAs." '672 Patent, at 2:26–29; *see* '672 Patent, at 2:30–43.

87. The '672 Patent describes systems and methods that comprise technological solutions to the technological problems described in the specification of the '672 Patent and are directed to a concrete improvement in wireless networking technology. For example, "[c]ertain embodiments of the invention may be found in a method and system for coexistence between 20 MHz and 40 MHz overlapping basic service sets (OBSS) in wireless local area networks (WLAN)." '672 Patent, at 3:66–4:2. "In an exemplary WLAN, which operates in accordance with IEEE 802.11 specifications, a WLAN station (STA) or WLAN access point (AP) may receive management frames, for example beacon frames, via a wireless communication medium. The STA and/or AP may be capable of communicating by utilizing 20 MHz RF channels or 40 MHz RF channels selected from a range of distinct RF channels. In an exemplary embodiment of the invention, the management frames may comprise information, which causes the receiving STA or

AP to restrict communication to those utilizing 20 MHz RF channels for at least a determined minimum period of time. In another exemplary embodiment of the invention, a lack of expected information within a management frame may cause the receiving STA or AP to restrict communications to those utilizing 20 MHz RF channels for at least a determined minimum period of time. In other exemplary embodiments of the invention, received management frames may cause the receiving STA or AP to restrict communications to those utilizing 20 MHz bandwidth for selected RF channels." '672 Patent, at 4:2–21.

88. The claims of the '672 Patent are directed to the enhanced coexistence techniques described in the '672 Patent. For example, claim 1 of the '672 Patent recites "[a] method for communicating data, the method comprising: receiving an information frame via a wireless communication medium at a receiving device, which is associated with a wireless network device group, wherein said information frame is transmitted by a transmitting device, which is associated with a different wireless network device group; determining whether said received information frame comprises capabilities information for said transmitting device; and reconfiguring said receiving device to restrict RF channel bandwidth utilized for transmitting and/or receiving signals via said wireless communication medium based on an absence of said capabilities information within said received information frame."

89. The claims of the '672 Patent are thus not directed toward fundamental economic practices, methods of organizing human activities, an abstract idea itself, or mathematical formulas. Rather, the claims of the '672 Patent are directed to a specific area of application, a specific collision avoidance method that reconfigures a receiving device to restrict RF channel bandwidth utilized for transmitting and/or receiving signals via said wireless communication medium based on an absence of capabilities information received from a first transmitting device.

90. The claims of the ’672 Patent also recite more than generic computer functionality and recite steps that were not conventional as of the priority date of the ’672 Patent. The claims of the ’672 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: “receiving an information frame via a wireless communication medium at a receiving device, which is associated with a wireless network device group, wherein said information frame is transmitted by a transmitting device, which is associated with a different wireless network device group;” “determining whether said received information frame comprises capabilities information for said transmitting device;” and “reconfiguring said receiving device to restrict RF channel bandwidth utilized for transmitting and/or receiving signals via said wireless communication medium based on an absence of said capabilities information within said received information frame.”

91. The claims of the ’672 Patent, either alone or as an ordered combination, thus recite improvements over prior art and conventional systems and methods and represent meaningful limitations and/or inventive concepts. Further, in view of these specific improvements, the claims of the ’672 Patent, when such claims are viewed as a whole and in ordered combination, were not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical as of the priority date of the ’672 Patent.

92. Avago is the owner and assignee of all substantial rights in the ’672 Patent. As such, Avago has standing to sue and the right to recover damages for the infringement of the ’672 Patent and pursue any and all causes of action and remedies, whether legal or equitable, related thereto.

93. On information and belief, since July 1, 2026, BMW AG, without license or Avago’s authority, has been making, using, offering to sell, selling, and importing, and continues

to make, use, offer to sell, sell, and import, in the United States products that directly infringe one or more claims of the ’672 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents. For example, as shown in the exemplary claim chart attached as **Exhibit C1**, which is hereby incorporated by reference as if fully set forth herein, BMW AG’s vehicles supporting implementation of, or backwards compatibility with, IEEE 802.11n Wi-Fi communication, such as, for example, BMW AG’s vehicles supporting implementation of IEEE 802.11ax (“the ’672 Accused Products”), including, but not limited to, BMW 2 Series, BMW 3 Series, BMW 4 Series, BMW 5 Series, BMW 7 Series, BMW X1 Series, BMW X2 Series, BMW X3 Series, BMW X5 Series, BMW X6 Series, BMW X7 Series, BMW i3 Series, BMW i5 Series, BMW i7 Series, BMW XM Series, BMW iX3 Series, and BMW M Model vehicles, satisfy each limitation of at least claim 1 of the ’672 Patent.

94. Since at least June 17, 2026, BMW AG has known of the ’672 Patent and that its vehicles infringe claims of the ’672 Patent, yet BMW AG has nevertheless continued its infringement and unlawful actions since July 1, 2026. Indeed, on June 17, 2026, representatives of Avago provided representatives of BMW AG a presentation showing the practice of claim 1 of European Patent No. EP 1 931 086 by an exemplary BMW AG product and identified the ’672 Patent as a related “Family Member.” And in this suit, BMW AG avers that “[a]t least claim 1 of the ’672 Patent is nearly identical to the example patent claim identified as the infringed claim in this infringement presentation.” In addition and in the alternative, by at least the date on which this Counterclaim was filed, BMW AG has known of the ’672 Patent and that its vehicles infringe claims of the ’672 Patent, yet BMW AG has nevertheless continued its infringement and unlawful actions.

95. On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, BMW AG has actively, knowingly, and intentionally induced infringement of one or more claims of the ’672 Patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell the ’672 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, BMW AG has actively promoted the importation, sale, and use of the ’672 Accused Products in marketing materials and on BMW AG’s website as well as at trade shows and through its sales and distribution channels that encourage infringing importation of, offers to sell, sales, and uses of the ’672 Accused Products, including, for example, in Owner’s Manuals and marketing materials for the ’672 Accused Products, which include instructions and illustrations that induce infringement of one or more claims of the ’672 Patent.[24] BMW AG also manufactured the ’672 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, BMW AG has had knowledge of the ’672 Patent and its infringement thereof since at least June 17, 2026, and either knew that the induced acts constituted patent infringement or, alternatively, was willfully blind to the infringement.

96. On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, BMW AG has contributorily infringed and continues to contributorily infringe one or more claims of the ’672 Patent by offering to sell, selling, and/or importing into the United States material components of the ’672 Accused Products that constitute a material part

---

[24] *E.g.*, https://www.bmwgroup.com/en/innovation/connected-car.html (as of at least July 11, 2026: “The new BMW Operating Systems 8.5 and 9 are our latest infotainment systems. … [T]hey bring together the latest generation of displays, controls and software as well as high-performance 5G connectivity and Gigabit Ethernet data processing to offer an exhilarating experience. With their drive-focused, intuitive operations and their wide-ranging entertainment offering – which includes in-car gaming and video streaming – the two systems successfully combine practical advantages with digital entertainment.”).

of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the ’672 Patent, and which are not a staple article or commodity of commerce suitable for substantial non-infringing use.

97. Avago has been and continues to be injured by BMW AG’s infringement of the ’672 Patent. Avago is entitled to recover damages adequate to compensate it for BMW AG’s infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

98. BMW AG’s acts of infringement of the ’672 Patent have been committed and are being committed with full knowledge of Avago’s patent rights and full knowledge of infringement. On information and belief, and for at least the reasons discussed above, BMW AG could not reasonably or subjectively have believed that its actions do not or did not constitute infringement of the ’672 Patent, nor could it reasonably or subjectively have believed that the patent is invalid. Despite that knowledge and subjective belief, BMW AG continued its infringing activities. BMW AG’s directly and indirectly infringing acts constitute willful, intentional, and deliberate infringement, entitling Avago to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys’ fees and costs.

99. Unless enjoined by this Court, BMW AG’s acts of infringement will continue to damage and cause irreparable harm to Avago.

**COUNT IV**
**(Infringement of U.S. Patent No. 9,065,673)**

100. Avago realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

101. United States Patent No. 9,065,673 (“the ’673 Patent”) is titled “Method and System for a Centralized Vehicular Electronics System Utilizing Ethernet with Audio Video

Bridging," and was duly and legally issued by the United States Patent and Trademark Office on June 23, 2015. The term of the '673 Patent has not expired. The '673 Patent is valid and enforceable. A copy of the '673 Patent is attached as **Exhibit D**.

102. The '673 Patent is directed to "a method and system for a centralized vehicular electronics system utilizing Ethernet with audio video bridging," and provides a key solution with respect to vehicular networking. '673 Patent, at 1:24–28.

103. The '673 Patent explains: "From staying connected, to assisting with daily tasks, to providing entertainment, electronics are becoming an increasingly important aspect of people's daily lives. Accordingly, vehicles are increasingly being equipped with advanced electronics equipment. For example, advanced stereos and sound systems, navigation equipment, back-up assist cameras, and an increasing number of diagnostic sensors are just some of the advanced electronics being installed in vehicles." '673 Patent, at 1:32–40.

104. The '673 Patent further explains: "Consequently, installation and interoperation of the various electronic components is becoming increasingly complicated and expensive. In this regard, the wiring alone required for communicating data to and from the various electronic devices is a major source of cost and complication in a vehicular electronic system. In this regard, specialized physical media, as is conventionally utilized in the vehicular industry, may be expensive. Additionally, existing standards for vehicular networking, such as MOST and IDB-1394, are immature and largely unproven at high data rates. Additionally, non-standardized devices, connectors, and/or protocols utilized by vehicular electronics networks may further add to the cost and complexity. Thus, conventional and traditional vehicular electronics system may be expensive, complicated, and difficult to upgrade." '673 Patent, at 1:40–54.

105. The ’673 Patent describes systems and methods that comprise technological solutions to the technological problems described in the specification of the ’673 Patent and are directed to a concrete improvement in vehicular networking technology. For example, “[c]ertain embodiments of the invention may be found in a method and system for a centralized vehicular electronics system utilizing Ethernet with audio video bridging. In various embodiments of the invention, electronic devices in a vehicle may be communicatively coupled via one or more Ethernet links and information may be communicated between the electronic devices over the Ethernet link(s) utilizing audio video bridging. At least one of multimedia, control, diagnostic, and sensory information may be communicated between the electronic devices. Accordingly, resources on the one or more Ethernet links may be reserved via AVB to give priority to one of multimedia, control, diagnostic, and sensory information.” ’673 Patent, at 2:28–40.

106. The claims of the ’673 Patent are directed to the enhanced techniques described in the ’673 Patent. For example, claim 1 of the ’673 Patent recites “[a] method for networking, the method comprising: directly coupling first audio video bridging enabled equipment to each electronic device within a first group of two or more electronic devices in a vehicle via respective first Ethernet links; directly coupling second audio video bridging enabled equipment to each electronic device within a second group of two or more electronic devices in the vehicle via respective second Ethernet links; coupling said first audio video bridging equipment to said second audio video bridging equipment via one or more third Ethernet links; and reserving resources on said one or more third Ethernet links utilizing said first and second audio video bridging equipment to enable information to be communicated between a first electronic device in the first group and a second electronic device in the second group and to give priority to mission critical electronic devices over non-mission critical electronic devices, at least one of said first and second groups

including a mission critical electronic device, said mission critical electronic devices transmitting diagnostic information."

107. The claims of the '673 Patent are thus not directed toward fundamental economic practices, methods of organizing human activities, an abstract idea itself, or mathematical formulas. Rather, the claims of the '673 Patent are directed to a specific area of application, within a vehicle network, reserving resources on Ethernet links coupling audio video bridging equipment and giving priority thereon to mission critical electronic devices transmitting diagnostic information over non-mission critical electronic devices.

108. The claims of the '673 Patent also recite more than generic computer functionality and recite steps that were not conventional as of the priority date of the '673 Patent. The claims of the '673 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "reserving resources on said one or more third Ethernet links utilizing said first and second audio video bridging equipment to enable information to be communicated between a first electronic device in the first group and a second electronic device in the second group and to give priority to mission critical electronic devices over non-mission critical electronic devices, at least one of said first and second groups including a mission critical electronic device, said mission critical electronic devices transmitting diagnostic information."

109. The claims of the '673 Patent, either alone or as an ordered combination, thus recite improvements over prior art and conventional systems and methods and represent meaningful limitations and/or inventive concepts. Further, in view of these specific improvements, the claims of the '673 Patent, when such claims are viewed as a whole and in ordered combination, were not

routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical as of the priority date of the ’673 Patent.

110. Avago is the owner and assignee of all substantial rights in the ’673 Patent. As such, Avago has standing to sue and the right to recover damages for the infringement of the ’673 Patent and pursue any and all causes of action and remedies, whether legal or equitable, related thereto.

111. On information and belief, since July 1, 2026, BMW AG, without license or Avago’s authority, has been making, using, offering to sell, selling, and importing, and continues to make, use, offer to sell, sell, and import, in the United States products that directly infringe one or more claims of the ’673 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents. For example, as shown in the exemplary claim chart attached as **Exhibit D1**, which is hereby incorporated by reference as if fully set forth herein, BMW AG’s vehicles implementing BMW’s Neue Klasse architecture (“the ’673 Accused Products”), including, but not limited to, BMW iX3 Series vehicles, satisfy each limitation of at least claim 1 of the ’673 Patent.

112. Since at least January 12, 2026, BMW AG has known of the ’673 Patent and that its vehicles infringe claims of the ’673 Patent, yet BMW AG has nevertheless continued its infringement and unlawful actions since July 1, 2026. Indeed, on January 12, 2026, representatives of Avago provided representatives of BMW AG a list of patents relevant to BMW AG and its vehicles, including, but not limited to, the ’673 Patent. In addition and in the alternative, by at least the date on which this Counterclaim was filed, BMW AG has known of the ’673 Patent and that its vehicles infringe claims of the ’673 Patent, yet BMW AG has nevertheless continued its infringement and unlawful actions.

113. On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, BMW AG has actively, knowingly, and intentionally induced

infringement of one or more claims of the ’673 Patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell the ’673 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, BMW AG has actively promoted the importation, sale, and use of the ’673 Accused Products in marketing materials and on BMW AG’s website as well as at trade shows and through its sales and distribution channels that encourage infringing importation of, offers to sell, sales, and uses of the ’673 Accused Products, including, for example, in Owner’s Manuals and marketing materials for the ’673 Accused Products, which include instructions and illustrations that induce infringement of one or more claims of the ’673 Patent.[25] BMW AG also manufactured the ’673 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, BMW AG has had knowledge of the ’673 Patent and its infringement thereof since at least January 12, 2026, and either knew that the induced acts constituted patent infringement or, alternatively, was willfully blind to the infringement.

114. On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, BMW AG has contributorily infringed and continues to contributorily infringe one or more claims of the ’673 Patent by offering to sell, selling, and/or importing into the United States material components of the ’673 Accused Products that constitute a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the ’673 Patent, and which are not a staple article or commodity of commerce suitable for substantial non-infringing use.

115. Avago has been and continues to be injured by BMW AG’s infringement of the ’673 Patent. Avago is entitled to recover damages adequate to compensate it for BMW AG’s

---

[25] *E.g.*, https://www.bmwgroup.com/en/news/general/2025/superbrains.html.

infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

116. BMW AG's acts of infringement of the '673 Patent have been committed and are being committed with full knowledge of Avago's patent rights and full knowledge of infringement. On information and belief, and for at least the reasons discussed above, BMW AG could not reasonably or subjectively have believed that its actions do not or did not constitute infringement of the '673 Patent, nor could it reasonably or subjectively have believed that the patent is invalid. Despite that knowledge and subjective belief, BMW AG continued its infringing activities. BMW AG's directly and indirectly infringing acts constitute willful, intentional, and deliberate infringement, entitling Avago to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

117. Unless enjoined by this Court, BMW AG's acts of infringement will continue to damage and cause irreparable harm to Avago.

**COUNT V**
**(Infringement of U.S. Patent No. 10,021,041)**

118. Avago realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

119. United States Patent No. 10,021,041 ("the '041 Patent") is titled "Vehicle Network Node Module," and was duly and legally issued by the United States Patent and Trademark Office on July 10, 2018. The term of the '041 Patent has not expired. The '041 Patent is valid and enforceable. A copy of the '041 Patent is attached as **Exhibit E**.

120. The '041 Patent is directed to "data and multimedia communication within a vehicle," and provides a key solution with respect to vehicle communication networks. '041 Patent, at 1:33–2:34.

121. The ’041 Patent explains: “As is known, a vehicle (e.g., automobile, truck, bus, an agricultural vehicle, ship, and/or aircraft) includes a vehicle communication network. The complexity of the vehicle communication network varies depending on the amount of electronic devices within the vehicle. For example, many more advanced vehicles include electronic modules for engine control, transmission control, antilock braking, body control, emissions control, etc. To support the various electronic devices within the vehicle, the automotive industry has generated numerous communication protocols.” ’041 Patent, at 1:37–46.

122. The ’041 Patent further explains that such communication protocols include “(1) J1850 and/or OBDII, which are typically used for vehicle diagnostic electronic components; (2) Intellibus, which is typically used for electronic engine control, transmission control other vehicle systems such as climate control, and it may also be used for drive-by-wire electronic control units (ECU); (3) high-speed controller area network (CAN), which is typically used for braking systems and engine management systems; (4) distributed system interface (DSI) and/or Bosch-Siemens-Temic (BST), which is typically used for safety related electronic devices; (5) byteflight, which is typically used for safety critical electronic device applications; (6) local interconnect network (LIN), which is typically used for intelligent actuators and/or intelligent sensors; (7) low-speed controller area network (CAN) and/or Motorola® interconnect (MI), which are typically used for low-speed electronic devices such as Windows, mirrors, seats and/or climate control; (8) mobile media link (MML), domestic digital data (D2B), smartwireX, inter-equipment bus (IEBus), and/or media oriented systems transport (MOST), which are typically used to support multimedia electronic devices within a vehicle such as a audio head unit and amplifiers, CD player, a DVD player, a cellular connection, a Bluetooth connection, peripheral computer connections, rear seat entertainment (RSE) units, a radio, digital storage, and/or a GPS navigation system; (9) Low-

Voltage Differential Signaling (LVDS), which are typically used to support, heads up display, instrument panel displays, other digital displays, driver assist digital video cameras, and (10) FlexRay, which may be used for safety critical features and/or by-wire applications." '041 Patent, at 1:47–2:14; *see* '041 Patent, Fig. 1.

123. The '041 Patent further explains: "To enable electronic components using different bus protocols to communicate with each other, one or more bus gateways may be included in the vehicle network. For example, in a safety related issue, a safety ECU may need to communicate with a braking ECU, and engine control ECU, and/or a transmission control ECU. In this example, the bus gateway performs some degree of protocol conversion to facilitate the communication between the ECUs of differing communication protocols." '041 Patent, at 2:15–23.

124. Due to the number and types of various electronic devices within the vehicle as well as the numerous communication protocols associated therewith, issues exist regarding the management and coordination of data and multimedia communication within the vehicle, including with respect to packet ingress, packet egress, and packet queueing in the vehicle communication network. *See* '041 Patent, at 1:33–2:34.

125. The '041 Patent describes systems and methods that comprise technological solutions to the technological problems described in the specification of the '041 Patent and are directed to a concrete improvement in vehicular networking technology. For example, the '041 Patent describes embodiments of a vehicular communication network that include a "network manager 40" that "performs a variety of functions to coordinate packet communication within the vehicle communication network and to facilitate network resource management." '041 Patent, at 10:1–4. "For example, the network manager 40 coordinate communication of packets, via the network fabric 32, among the vehicle control modules 38, the memory 46, and the multimedia

processing module(s) 48 based on individual content of the packets and in accordance with a global vehicle network communication protocol. The global vehicle network communication protocol includes information regarding a network fabric formatting of the packets, (e.g., packet format as shown in FIG. 26), information regarding packet transmission prioritization schemes (e.g., mission critical packets having a higher priority, infotainment (information and/or entertainment) packets having a lower priority, etc.), information regarding network management processing (e.g., network fabric resources and devices coupled to the network fabric), and information regarding vehicle network operation parameters (e.g., network configuration management).” ’041 Patent, at 10:4–22.

126. The claims of the ’041 Patent are directed to the enhanced techniques described in the ’041 Patent. For example, claim 15 of the ’041 Patent recites: “[a] vehicular communication device, comprising: a vehicular Ethernet interface configured to support Ethernet communications with a plurality of vehicle devices via an Ethernet vehicular communication network in a vehicle; and processing circuitry, wherein the vehicular Ethernet interface and/or the processing circuitry are configured to: receive a plurality of device packets from the plurality of vehicle devices, at least some device packets of the plurality of device packets having a first priority and at least some device packets of the plurality of device packets having a second priority, wherein at least some of the device packets having the first priority carry data for controlling operation of the vehicle and at least some of the device packets having the second priority carry data for use by a non-safety related device of the vehicle; determine priority of received device packets based upon contents of the device packets; for device packets having the first priority, queue the device packets for output with a first priority; and for device packets having the second priority, queue the device

packets having the second priority for output with a second priority that is lesser than the first priority."

127. The claims of the '041 Patent are thus not directed toward fundamental economic practices, methods of organizing human activities, an abstract idea itself, or mathematical formulas. Rather, the claims of the '041 Patent are directed to a specific area of application, a vehicle communication device using a specific prioritization scheme with respect to packets within an Ethernet vehicular communication network in a vehicle based on the vehicle device from which the packet(s) originates and the data in the packet(s).

128. The claims of the '041 Patent also recite more than generic computer functionality and recite steps that were not conventional as of the priority date of the '041 Patent. The claims of the '041 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "a vehicular Ethernet interface configured to support Ethernet communications with a plurality of vehicle devices via an Ethernet vehicular communication network in a vehicle;" "processing circuitry, wherein the vehicular Ethernet interface and/or the processing circuitry are configured to:"; "receive a plurality of device packets from the plurality of vehicle devices, at least some device packets of the plurality of device packets having a first priority and at least some device packets of the plurality of device packets having a second priority, wherein at least some of the device packets having the first priority carry data for controlling operation of the vehicle and at least some of the device packets having the second priority carry data for use by a non-safety related device of the vehicle;" "determine priority of received device packets based upon contents of the device packets;" "for device packets having the first priority, queue the device packets for output with a first priority;" and "for device packets having the second

priority, queue the device packets having the second priority for output with a second priority that is lesser than the first priority."

129. The claims of the '041 Patent, either alone or as an ordered combination, thus recite improvements over prior art and conventional systems and methods and represent meaningful limitations and/or inventive concepts. Further, in view of these specific improvements, the claims of the '041 Patent, when such claims are viewed as a whole and in ordered combination, were not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical as of the priority date of the '041 Patent.

130. Avago is the owner and assignee of all substantial rights in the '041 Patent. As such, Avago has standing to sue and the right to recover damages for the infringement of the '041 Patent and pursue any and all causes of action and remedies, whether legal or equitable, related thereto.

131. On information and belief, since July 1, 2026, BMW AG, without license or Avago's authority, has been making, using, offering to sell, selling, and importing, and continues to make, use, offer to sell, sell, and import, in the United States products that directly infringe one or more claims of the '041 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents. For example, as shown in the exemplary claim chart attached as **Exhibit E1**, which is hereby incorporated by reference as if fully set forth herein, BMW AG's vehicles implementing BMW's Neue Klasse architecture ("the '041 Accused Products"), including, but not limited to, BMW iX3 Series vehicles, satisfy each limitation of at least claim 15 of the '041 Patent.

132. Since at least January 12, 2026, BMW AG has known of the '041 Patent and that its vehicles infringe claims of the '041 Patent, yet BMW AG has nevertheless continued its infringement and unlawful actions since July 1, 2026. Indeed, on January 12, 2026, representatives of Avago provided representatives of BMW AG a list of patents relevant to BMW AG and its

vehicles, including, but not limited to, the ’041 Patent. In addition and in the alternative, by at least the date on which this Counterclaim was filed, BMW AG has known of the ’041 Patent and that its vehicles infringe claims of the ’041 Patent, yet BMW AG has nevertheless continued its infringement and unlawful actions.

133. On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, BMW AG has actively, knowingly, and intentionally induced infringement of one or more claims of the ’041 Patent under 35 U.S.C. § 271(b) by actively encouraging others to import, make, use, sell, and/or offer to sell the ’041 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, BMW AG has actively promoted the importation, sale, and use of the ’041 Accused Products in marketing materials and on BMW AG’s website as well as at trade shows and through its sales and distribution channels that encourage infringing importation of, offers to sell, sales, and uses of the ’041 Accused Products, including, for example, in Owner’s Manuals and marketing materials for the ’041 Accused Products, which include instructions and illustrations that induce infringement of one or more claims of the ’041 Patent.[26] BMW AG also manufactured the ’041 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, BMW AG has had knowledge of the ’041 Patent and its infringement thereof since at least January 12, 2026, and either knew that the induced acts constituted patent infringement or, alternatively, was willfully blind to the infringement.

134. On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, BMW AG has contributorily infringed and continues to contributorily infringe one or more claims of the ’041 Patent by offering to sell, selling, and/or importing into

---

[26] *E.g.*, https://www.bmwgroup.com/en/news/general/2025/superbrains.html.

the United States material components of the ’041 Accused Products that constitute a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the ’041 Patent, and which are not a staple article or commodity of commerce suitable for substantial non-infringing use.

135. Avago has been and continues to be injured by BMW AG’s infringement of the ’041 Patent. Avago is entitled to recover damages adequate to compensate it for BMW AG’s infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

136. BMW AG’s acts of infringement of the ’041 Patent have been committed and are being committed with full knowledge of Avago’s patent rights and full knowledge of infringement. On information and belief, and for at least the reasons discussed above, BMW AG could not reasonably or subjectively have believed that its actions do not or did not constitute infringement of the ’041 Patent, nor could it reasonably or subjectively have believed that the patent is invalid. Despite that knowledge and subjective belief, BMW AG continued its infringing activities. BMW AG’s directly and indirectly infringing acts constitute willful, intentional, and deliberate infringement, entitling Avago to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys’ fees and costs.

137. Unless enjoined by this Court, BMW AG’s acts of infringement will continue to damage and cause irreparable harm to Avago.

## COUNT VI
## (Infringement of U.S. Patent No. 11,025,364)

138. Avago realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

139. United States Patent No. 11,025,364 (“the ’364 Patent”) is titled “Robust Line Coding Scheme for Communication Under Severe External Noises,” and was duly and legally issued by the United States Patent and Trademark Office on June 1, 2021. The term of the ’364 Patent has not expired. The ’364 Patent is valid and enforceable. A copy of the ’364 Patent is attached as **Exhibit F**.

140. The ’364 Patent is directed to “networking hardware used for communication,” and provides a key solution to a challenge in high-speed wired communication: achieving target high speed data rates, even under severe external noises. ’364 Patent, at 1:18–19, 1:23–30, 1:56–2:25.

141. The ’364 Patent explains: “High speed data networks form part of the backbone of what has become indispensable worldwide data connectivity. Within the data networks, network devices such as switching devices direct data packets from source ports to destination ports, helping to eventually guide the data packets from a source to a destination. Improvements in packet handling, including improvements in path resolution, will further enhance performance of data networks.” ’364 Patent, at 1:23–30.

142. The ’364 Patent further explains: “In certain communication applications under severe noises, such as the IEEE 802.3bp 1000BASE-T1 automotive Ethernet PHY, it may be desirable to have a robust system while at the same time achieve target high speed data rates, even under severe external noises. The external noises may be due to narrow band interferences, mechanical vibrations, electrostatic discharges, or other sources. Furthermore the characteristics of these noises may rapidly change in time. It may be further desirable to maintain a robust system and minimize interruptions to the communication link.” ’364 Patent, at 1:56–65.

143. The ’364 Patent describes systems and methods that comprise technological solutions to the technological problems described in the specification of the ’364 Patent and are

directed to a concrete improvement in network communication technology. For example, the '364 Patent "provides networking hardware comprising circuitry using a robust line coding scheme for communication under severe external noises." '364 Patent, at 1:66–2:1. "The scheme uses a non-complex bit-to-symbol mapping, the forward error correction (FEC) coding, and an additive bit scrambler after the FEC." '364 Patent, at 2:2–4. Moreover, the '364 Patent describes that "[t]he line coding scheme may be utilized in various communication environments," such as "in the automobile 1000 Mbits per second Ethernet PHY over single unshielded twisted pair (UTP) IEEE 802.3bp application" as well as other applications, including "100 m industrial Ethernet PHY applications." '364 Patent, at 2:4–25.

144. The claims of the '364 Patent are directed to the enhanced communication techniques described in the '364 Patent. For example, claim 13 of the '364 Patent recites "[a] system comprising: a first device configured to generate at least one forward error correction (FEC) frame that contains data and corresponding management information and transmit the at least one FEC frame over a communication link to a second device; and the second device configured to receive the at least one FEC frame and decode the at least one FEC frame to obtain the data and management information, wherein the first device is communicatively coupled to a first automobile component and the second device is communicatively coupled to a second automobile component."

145. The claims of the '364 Patent are thus not directed toward fundamental economic practices, methods of organizing human activities, an abstract idea itself, or mathematical formulas. Rather, the claims of the '364 Patent are directed to a specific area of application, networking hardware comprising circuitry using a robust line coding scheme for communication under severe external noises.

146. The claims of the ’364 Patent also recite more than generic computer functionality and recite steps that were not conventional as of the priority date of the ’364 Patent. The claims of the ’364 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: “a first device configured to generate at least one forward error correction (FEC) frame that contains data and corresponding management information and transmit the at least one FEC frame over a communication link to a second device”; “the second device configured to receive the at least one FEC frame and decode the at least one FEC frame to obtain the data and management information”; and “wherein the first device is communicatively coupled to a first automobile component and the second device is communicatively coupled to a second automobile component.”

147. The claims of the ’364 Patent, either alone or as an ordered combination, thus recite improvements over prior art and conventional systems and methods and represent meaningful limitations and/or inventive concepts. Further, in view of these specific improvements, the claims of the ’364 Patent, when such claims are viewed as a whole and in ordered combination, were not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical as of the priority date of the ’364 Patent.

148. Avago is the owner and assignee of all substantial rights in the ’364 Patent. As such, Avago has standing to sue and the right to recover damages for the infringement of the ’364 Patent and pursue any and all causes of action and remedies, whether legal or equitable, related thereto.

149. On information and belief, since July 1, 2026, BMW AG, without license or Avago’s authority, has been making, using, offering to sell, selling, and importing, and continues to make, use, offer to sell, sell, and import, in the United States products that directly infringe one

or more claims of the ’364 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents. For example, as shown in the exemplary claim chart attached as **Exhibit F1**, which is hereby incorporated by reference as if fully set forth herein, BMW AG’s vehicles supporting implementation of 1000BASE-T1 automotive Ethernet links (“the ’364 Accused Products”), including, but not limited to, BMW 2 Series, BMW 3 Series, BMW 4 Series, BMW 5 Series, BMW 7 Series, BMW X1 Series, BMW X2 Series, BMW X3 Series, BMW X5 Series, BMW X6 Series, BMW X7 Series, BMW i3 Series, BMW i5 Series, BMW i7 Series, BMW XM Series, BMW iX3 Series, and BMW M Model vehicles, satisfy each limitation of at least claim 13 of the ’364 Patent.

150. Since at least January 12, 2026, BMW AG has known of the ’364 Patent and that its vehicles infringe claims of the ’364 Patent, yet BMW AG has nevertheless continued its infringement and unlawful actions since July 1, 2026. Indeed, on January 12, 2026, representatives of Avago provided representatives of BMW AG a list of patents relevant to BMW AG and its vehicles, including, but not limited to, the ’364 Patent. Moreover, on March 20, 2026, representatives of Avago provided representatives of BMW AG a presentation showing the practice of claim 1 of U.S. Patent No. 10,447,431, the parent of the ’364 Patent, by an exemplary BMW AG product and identified the ’364 Patent as a related “Family Member.” In addition and in the alternative, by at least the date on which this Counterclaim was filed, BMW AG has known of the ’364 Patent and that its vehicles infringe claims of the ’364 Patent, yet BMW AG has nevertheless continued its infringement and unlawful actions.

151. On information and belief, in violation of 35 U.S.C. § 271(b), literally or under the doctrine of equivalents, BMW AG has actively, knowingly, and intentionally induced infringement of one or more claims of the ’364 Patent under 35 U.S.C. § 271(b) by actively

encouraging others to import, make, use, sell, and/or offer to sell the ’364 Accused Products in the United States with knowledge that those actions would constitute infringement. For example, on information and belief, BMW AG has actively promoted the importation, sale, and use of the ’364 Accused Products in marketing materials and on BMW AG’s website as well as at trade shows and through its sales and distribution channels that encourage infringing importation of, offers to sell, sales, and uses of the ’364 Accused Products, including, for example, in Owner’s Manuals and marketing materials for the ’364 Accused Products, which include instructions and illustrations that induce infringement of one or more claims of the ’364 Patent.[27] BMW AG also manufactured the ’364 Accused Products intending that they would be imported into, and sold and used in, the United States. As mentioned above, BMW AG has had knowledge of the ’364 Patent and its infringement thereof since at least January 12, 2026, and either knew that the induced acts constituted patent infringement or, alternatively, was willfully blind to the infringement.

152. On information and belief, in violation of 35 U.S.C. § 271(c), literally or under the doctrine of equivalents, BMW AG has contributorily infringed and continues to contributorily infringe one or more claims of the ’364 Patent by offering to sell, selling, and/or importing into the United States material components of the ’364 Accused Products that constitute a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the ’364 Patent, and which are not a staple article or commodity of commerce suitable for substantial non-infringing use.

---

[27] *E.g.*, https://www.bmwgroup.com/en/innovation/connected-car.html (as of at least July 11, 2026: “The new BMW Operating Systems 8.5 and 9 are our latest infotainment systems. … [T]hey bring together the latest generation of displays, controls and software as well as high-performance 5G connectivity and Gigabit Ethernet data processing to offer an exhilarating experience. With their drive-focused, intuitive operations and their wide-ranging entertainment offering – which includes in-car gaming and video streaming – the two systems successfully combine practical advantages with digital entertainment.”).

153. Avago has been and continues to be injured by BMW AG's infringement of the '364 Patent. Avago is entitled to recover damages adequate to compensate it for BMW AG's infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

154. BMW AG's acts of infringement of the '364 Patent have been committed and are being committed with full knowledge of Avago's patent rights and full knowledge of infringement. On information and belief, and for at least the reasons discussed above, BMW AG could not reasonably or subjectively have believed that its actions do not or did not constitute infringement of the '364 Patent, nor could it reasonably or subjectively have believed that the patent is invalid. Despite that knowledge and subjective belief, BMW AG continued its infringing activities. BMW AG's directly and indirectly infringing acts constitute willful, intentional, and deliberate infringement, entitling Avago to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

155. Unless enjoined by this Court, BMW AG's acts of infringement will continue to damage and cause irreparable harm to Avago.

## **PRAYER FOR RELIEF**

Wherefore, Counterclaim-Plaintiff Avago prays for the following judgment and relief against BMW AG:

a. Enter a judgment that BMW AG has infringed the Counterclaim Patents;

b. Grant a permanent injunction restraining and enjoining BMW AG and its officers, directors, agents, servants, employees, successors, assigns, parents, subsidiaries, affiliated or related companies, and attorneys from directly or indirectly infringing the Counterclaim Patents;

c. Award Avago damages in an amount sufficient to compensate Avago for BMW AG's infringement of the Counterclaim Patents, including lost profits but not less than a reasonable royalty, together with pre- and post-judgment interest and costs;

d. Enter a declaration that the case is exceptional and correspondingly award Avago attorneys' fees and costs under 35 U.S.C. § 285;

e. Find that BMW AG's infringement of the Counterclaim Patents has been willful and award enhanced damages, interest, and costs to Avago under 35 U.S.C. § 284; and

f. Grant such other and further relief as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Avago demands a trial by jury on all issues triable of right by a jury.

Dated: November 4, 2026

Respectfully submitted,

/s/ *Russell A. Korn*

KILPATRICK TOWNSEND & STOCKTON LLP

Mitchell G. Stockwell
Russell A. Korn
Joshua H. Lee
Andrew D. Evans
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: mstockwell@ktslaw.com
Email: rkorn@ktslaw.com
Email: jlee@ktslaw.com
Email: ddevans@ktslaw.com

Kevin M. Bell
1400 Wewatta Street, Suite 600
Denver, CO 80202
Telephone: (303) 571-4000
Facsimile: (303) 571-4321
Email: kbell@ktslaw.com

GILLAM & SMITH, LLP

MELISSA R. SMITH
(Texas State Bar No. 24001351)
303 South Washington Avenue
Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
Email: melissa@gillamsmithlaw.com

*Attorneys for Broadcom Inc. and Avago Technologies International Sales Pte. Limited*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 4, 2026, all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system pursuant to Local Rule CV-5(a)(3).

*/s/ Russell A. Korn*
Russell A. Korn